CRENSHAW, Judge.
Brittany and Joseph Brown appeal an order granting Michael Lunskis a new trial on the issue of damages in this automobile *78 negligence case. The trial court granted the new trial after it directed a verdict on the issue of the permanency of one of Mr. Lunskis’s claimed injuries. The directed verdict was entered on a renewed motion for directed verdict filed after the jury had returned its verdict. The focus of that motion was not the primary injuries allegedly sustained by Mr. Lunskis, but rather a temporomandibular joint (TMJ) condition. We conclude that the holding in Wald v. Grainger, 64 So.3d 1201 (Fla. 2011), does not support the trial court’s decision to grant the directed verdict. Accordingly, we reverse the order granting new trial and remand for entry of a judgment based on the jury’s verdict that awarded Mr. Lunskis his past medical expenses and determined that he had not sustained a permanent injury.
I. The Accident and the Primary Injuries at Issue During the Trial
This case arises from a relatively minor automobile accident that occurred on January 21, 2009. Mr. Lunskis was on his way to a doctor’s appointment, driving his car on a four-lane street in a residential neighborhood. He was wearing his seatbelt. Brittany Brown was driving her father’s car in the opposite direction on the street. She turned left at an intersection in front of Mr. Lunskis whose view of her was blocked by a large bus. Though fortunately Ms. Brown nearly cleared the intersection, Mr. Lunskis’s car collided with her car. His front passenger-side fender hit her rear passenger-side fender behind the rear wheel. Mr. Lunskis’s car, a 1996 Mazda sedan, was still operable and sustained damage totaling $1660.70, including sales tax. Neither the police nor an ambulance was called to the scene of this accident. After the drivers exchanged information and talked for a while, they both drove their cars away from the scene of the accident.
Mr. Lunskis continued to his doctor’s appointment. At the time of the accident, Mr. Lunskis was a retired librarian in his mid-fifties. He had been treated by his regular physician since 2006. Mr. Lun-skis’s regular physician had been providing medication to help Mr. Lunskis’s control his diabetes, high blood pressure, and fi-bromyalgia. She was also helping him control his weight. As a result of the accident, he was late to his appointment, and it is unclear whether the doctor actually examined him on that date. He apparently received no treatment or medication on the day of the accident.
Mr. Lunskis felt “achy” the following day, but did not seek treatment until he returned to his regular physician a week later. His regular physician did not treat patients involved in automobile accidents. She gave him a list of doctors from which he selected Dr. Clara Creighton.
Mr. Lunskis first saw Dr. Creighton on January 30, 2009. She primarily treats patients who have been in automobile accidents. Mr. Lunskis testified at trial that Dr. Creighton would not treat him unless he hired a lawyer and gave her a letter of protection. Dr. Creighton saw Mr. Lun-skis on a regular basis from January 30 until June 26, 2009. She primarily provided medications and physical therapy. Thereafter he saw her in mid-August 2010 and a few more times in the months preceding the trial.
Sometime after Mr. Lunskis began being treated by Dr. Creighton, he began having increased pain in his left knee. Dr. Creighton referred Mr. Lunskis to an orthopedic surgeon in late April. The surgeon diagnosed a strained ligament, a meniscus tear, and a Baker’s cyst. He performed arthroscopic surgery on the left knee. He testified that the condition in the knee was caused by the accident.
*79 In addition to the knee injury, Mr. Lun-skis testified that he had low back and neck pain caused by the accident. These conditions had been treated conservatively. Without detailing the evidence, the jury received conflicting testimony from the doctors presented by Mr. Lunskis and those presented by the Browns as to whether the pain in Mr. Lunskis’s back and neck was caused by the accident and whether it was permanent. The Browns maintained that the conditions in his back as well as the conditions in his knee were long-standing, degenerative conditions unrelated to the accident.
At trial, the Browns admitted that Ms. Brown had been negligent at the time of the accident and that Mr. Lunskis had not committed any comparative negligence. They admitted that Mr. Lunskis had sustained at least some injury. Thus, the issues presented to the jury required it to decide what injuries were caused by the accident and whether any of those injuries were permanent. The jury decided that Mr. Lunskis had sustained no permanent injuries and awarded him $58,763.43, which was the precise amount of his medical bills.
II. The TMJ Condition
In both the original motion for directed verdict and in the renewed motion, Mr. Lunskis argued that there was no jury question that he had sustained a TMJ injury that was permanent. Oddly, the evidence concerning his alleged TMJ syndrome came only from Dr. Creighton. Mr. Lunskis never testified that he experienced any TMJ pain.
Dr. Creighton, like most of the physicians in this case, did not testify live at the trial. In her video deposition, she explained her credentials without identifying the medical school she attended. She joined the Navy after medical school, becoming a flight surgeon. Thereafter she practiced medicine in a small Iowa town and eventually transitioned to work in hospital emergency rooms. She is board certified in emergency medical treatment, having been grandfathered into that certification based on her experience. Following her own automobile accident in 1995, she left the field of emergency medical treatment and began working in a clinic that specializes in patients who had been in automobile accidents. She apparently has no special training in orthopedics, neurology, or dentistry.
Dr. Creighton testified, and her reports confirm, that her initial examination showed signs of mild bilateral TMJ pain and that she suspected TMJ dysfunction. She continued to note some level of TMJ syndrome throughout Mr. Lunskis’s visits to her office. She never referred him to a specialist to diagnose this syndrome or recommend treatment. In her “final narrative report” on June 26, 2009, she recommended that he see a “TMJ Specialist” “to undergo diagnostic testing and fabrication of an occlusal splint.” But Mr. Lunskis never went to any dentist or physician who specialized in TMJ to receive that diagnosis.
In addition to testifying that Mr. Lun-skis had a permanent TMJ syndrome that she related to this accident, Dr. Creighton opined that numerous other injuries throughout Mr. Lunskis’s body existed, were permanent, and were related to this accident. The jury rejected each and every opinion of permanency to which Dr. Creighton testified.
III. Standard of Review
We review the trial court’s rulings on a motion for directed verdict de novo and apply the same test used by the trial court in ruling on the motion. Fell v. Carlin, 6 So.3d 119, 120 (Fla. 2d DCA 2009) (citing Sims v. Cristinzio, 898 So.2d 1004, 1006 (Fla. 2d DCA 2005)).
*80 A motion for directed verdict should be granted only where no view of the evidence, or inferences made therefrom, could support a verdict for the nonmov-ing party. In considering a motion for directed verdict, the court must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor of the nonmoving party. If there are conflicts in the evidence or different reasonable inferences that may be drawn from the evidence, the issue is factual and should be submitted to the jury.
Id. (quoting Sims, 898 So.2d at 1005).
IV. Wald v. Grainger
In Wald v. Grainger, the supreme court held that a trial court can direct a verdict on permanency based on expert testimony even though such determinations are usually made by juries in personal injury cases. 64 So.3d 1201, 1204 (Fla.2011). The court outlined the procedure for such issues:
A plaintiff can establish a prima facie case of permanency by presenting expert testimony of permanency. Once this is done, the burden shifts to the defendant to present countervailing expert testimony, severely impeach the plaintiffs expert,[1] or present other evidence which creates a direct conflict with the plaintiffs evidence. If the defendant succeeds in this endeavor, a jury question is presented; if not, a directed verdict on permanency is appropriate.
Id. at 1204-05 (citations omitted). The court then further explained:
A jury is free to weigh the opinion testimony of expert witnesses, and either accept, reject or give that testimony such weight as it deserves considering the witnesses’ qualifications, the reasons given by the witness for the opinion expressed, and all the other evidence in the case, including lay testimony. However, when medical evidence on permanence is undisputed, unimpeached, or not otherwise subject to question based on the other evidence presented at trial, the jury is not free to simply ignore or arbitrarily reject that evidence and render a verdict in conflict with it.
Id. at 1205.
Thus, Wald allows for a directed verdict on permanency based on expert testimony except when (1) it is rebutted by another expert, (2) the testimony is impeached, or (3) other conflicting evidence is presented. See id. at 1204. The first and third manners are not particularly complicated, but impeachment of the expert warrants further discussion.
In Wald, the supreme court specifically stated how an expert’s testimony on permanency can be impeached or otherwise rebutted:
[T]he jury’s ability to reject the testimony must be based on some reasonable basis in the evidence. This can include conflicting medical evidence, evidence that impeaches the expert’s testimony or calls it into question, such as the failure of the plaintiff to give the medical expert an accurate or complete medical history, conflicting lay testimony or evidence that disputes the injury claim, or the plaintiffs conflicting testimony or self-contradictory statements regarding the *81 injury. For example, when a medical expert’s opinion is predicated on an incomplete or inaccurate medical history, the jury is free to reject the expert medical testimony, even without conflicting medical testimony, if there is conflicting lay testimony.
Id. at 1205-06 (citations omitted). From our review of the record, we determine that there were several bases in the evidence for the jury to disregard the testimony of Mr. Lunskis’s witness.
Y. Application of Wald v. Grainger
The record in this case reflects three critical reasons a directed verdict should not have been entered in this case. First, the independent medical examiner, a witness for the Browns, testified that there was “no permanent injury.” This itself was reason enough a directed verdict should not have been granted, because it is for the jury to decide which testimony was more credible, and it cannot be said that there was no “conflicting medical evidence.” Id. at 1206. We recognize though that the independent medical examiner did not testify specifically that “there was no permanent injury to the TMJ.” Second, the expertise regarding TMJ issues of Mr. Lunskis’s witness, Dr. Creighton, was hotly debated in that her ability to diagnose Mr. Lunskis at all was a feature of the trial in this case. The record reflects that Dr. Creighton treats patients in accident cases often but generally refers out TMJ issues. She is not an orthopedic surgeon and has never been one, nor does she have experience with dentistry. Therefore it cannot be said that there was no “evidence that impeaches the expert’s testimony or calls it into question” because her credibility as an expert itself was subject to criticism. Id. Third, “when a medical expert’s opinion is predicated on an incomplete or inaccurate medical history, the jury is free to reject the expert medical testimony.” Id. In this case, the record reflects that Dr. Creighton was not apprised of Mr. Lunskis’s historical dental problems. The record also reflects that there was testimony that TMJ and dental issues are often linked. We need not determine the veracity of that argument but recognize that it is relevant to the jury’s role in weighing expert testimony. It suffices to say that Dr. Creighton was not given a complete medical record regarding Mr. Lunskis, allowing the jury to reject Dr. Creighton’s testimony. In reviewing the record in this case, it is clear that there were several grounds upon which the expert’s testimony could be rejected by the jury.

VI. Conclusion

Accordingly, we reverse the order granting new trial and remand for entry of a judgment based on the jury’s verdict.
Reversed and remanded with directions.
ALTENBERND and WALLACE, JJ„ Concur.

. As Judge Makar has noted, "[t]he Court's opinion is internally inconsistent, stating in its background discussion that the testimony or evidence must ‘severely impeach’ a plaintiff's expert but later saying that evidence that simply ‘impeaches’ the expert's testimony is reasonable for that purpose.” Foster v. State Farm Mut. Ins. Co., 85 So.3d 1219, 1220 n. 1 (Fla. 1st DCA 2012) (Makar, J., specially concurring) (citations omitted).